UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIAN DEVELOPMENT, LLC and<br>CONNECTICUT BUILDING SOLUTIONS, LLC,<br>   Plaintiffs/Counterclaim Defendants,<br><br>   v.<br><br>OLD VILLAGE MILL, LLC,<br>   Defendant/Counterclaim Plaintiff. | No. 3:13-cv-01510 (MPS) |

**MEMORANDUM OF DECISION ON MOTION FOR
PRELIMINARY INJUNCTION AND OTHER MOTIONS**

This dispute calls on the Court to determine whether a landowner, Defendant/ Counterclaim Plaintiff Counterclaim Old Village Mill, LLC ("OVM"), may obtain a preliminary injunction suspending a land excavation contract and barring the excavator, Plaintiff/Counterclaim Defendant Julian Development, LLC ("Julian"), from gaining further access to the property.[1] After OVM locked Julian out of the property, Julian sued in state court for injunctive relief and declaratory relief, seeking both a temporary injunction and other interim relief, and asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, and conversion. OVM removed the lawsuit to this court, and filed counterclaims against Julian for breach of contract, breach of the covenant of good faith and fair dealing, conversion, trespass, and violation of the Connecticut Unfair Trade Practices Act, and sought its own

---

[1] Plaintiff/Counterclaim Defendant Connecticut Building Solutions, LLC, formerly known as Moosup Meadows, LLC ("Moosup"), is also a party to the contract between OVM and Julian. Moosup is the holder of certain mineral rights on the property. While Julian initially named Moosup as a defendant, the Court permitted the parties to realign Moosup as a plaintiff since its interests more closely aligned with Julian and because failure to do so would have destroyed diversity jurisdiction and, therefore, the Court's ability to hear the case. Though Moosup has an interest in the outcome of this dispute and was represented at the preliminary injunction hearing, Moosup has remained largely neutral and did not present any evidence at the hearing (although a Moosup representative testified at the hearing).

preliminary injunction barring Julian from interfering with the property, as well as a declaratory judgment that the contract has been terminated.

The Court had an evidentiary hearing on all pending motions for interim relief and related motions on November 21, 2013. Having carefully considered the exhibits and testimony offered at the hearing, I grant the preliminary injunction sought by OVM because I find that it has shown a clear likelihood of success on the merits of its claim that Julian's frequent late payments materially breached the contract, thereby providing grounds to terminate the contract, and that, absent injunctive relief, OVM will suffer irreparable harm because Julian's continued use of the property after OVM's proper termination of the contract would amount to trespass. For these reasons, Julian's motions for prejudgment remedy (dkt. # 4) and temporary injunction (dkt # 22)[2] are denied, and OVM's motion for preliminary injunction (dkt. # 28) is granted.

## Procedural History

On October 16, 2013, OVM removed this case from the Bridgeport Superior Court, where Julian had filed a Motion for Prejudgment Remedy and a Motion for Temporary Injunction. (Dkt. ## 1, 4, 22.) On November 5, 2013, OVM filed a Motion for Preliminary Injunction. (Dkt. # 28). A hearing on the requests for interim relief was held on November 21, 2013. After the hearing, the parties informed the Court that they wished to pursue settlement discussions with the assistance of United States Magistrate Judge William I. Garfinkel, and this Court thus refrained from preparing a decision.

The parties entered into a stipulation on November 27, 2013 (dkt. # 73) in which they agreed to resume operations under their preexisting contract, subject to Julian's making certain

---

[2] Julian filed a Motion for Temporary Injunction in State Court. This motion was not, however, included in the removal papers filed with this Court. The Court therefore construes Julian's Emergency Motion for Hearing on Temporary Injunction and Restraining Order (dkt. #22) as a Motion for Temporary Injunction.

payments, until receipt of a decision from the Court.  On January 1, 2014, Julian filed a status report (dkt. # 75) stating that the parties had entered into negotiations that would effectively nullify the need to issue a decision on the pending motions, and requesting that the Court continue to refrain from issuing a decision.  On January 10, 2014, OVM filed a status report (dkt. # 77) stating that the parties had reached an impasse, and requesting that the Court issue a decision.

### Findings of Fact

The following findings of fact are based on the exhibits and testimony presented during the November 21, 2013 hearing.  Six witnesses testified at the hearing: John (a.k.a. Jean) Paul Gauvin (the sole member of OVM), Jason Julian (a member of Julian), Andrew Julian (a member of Julian), George Scarveles (the manager of Moosup), Rudy Mobilio (a customer of Julian), and Charles Corson (a witness called by OVM).

####    A. Agreement Between the Parties

OVM is the owner of land located in Plainfield, CT (the "Property") and Moosup is the holder of mineral rights on the Property.  In March 2011, the parties entered into an Excavation and Removal Agreement ("ERA," Exhibit 1) to permit Julian to excavate and remove minerals, rocks, and other precious metals from the Property in exchange for specified payments to both OVM and Moosup.  Both OVM and Julian participated in the negotiation of the ERA.  (*See* Hr'g Tr. at 16, 159.)  While the ERA remains in place, no party other than Julian is permitted to conduct business on the Property.  (Paragraph 9 ("During the Term or for so long as this Agreement is in effect, neither [OVM] nor [Moosup] shall permit any person or entity other than [Julian] or its assigns, to engage in any activity or business on the Property, including, without limitation, mining.").)

The provisions of the ERA most pertinent to the late payment issue and OVM's right to terminate the agreement are Paragraphs 2 and 14. Paragraph 2, "Compensation," provides as follows:

> The first payment of the Compensation shall be for the first two (2) weeks of hauling commencing with the date the first load of Stone was removed from the Property (the "First Removal") and shall be simultaneously paid by [Julian] to [OVM] and [Moosup] thirty (30) days from the date of the First Removal. All future Compensation will be paid on a semi-monthly basis commencing fifteen (15) days from the date of the first Compensation payment and every fifteen (15) days thereafter.

At the hearing, both Julian and OVM agreed that Paragraph 2 of the ERA sets up a payment schedule with a lag of fifteen days. (Hr'g Tr. at 196-99.) In other words, payment for a two-week period of stone excavation would be due fifteen days after the conclusion of that period.

In addition, Paragraph 2(b)(iv) states that "[a]ll payments shall be subject to time being of the essence."[3] Paragraph 14, "Default," provides as follows:

> If any party shall be in default of the representations, warranties, covenants or other terms and conditions hereof (each a "Default"), then, except as set forth below, a non-defaulting party shall give the defaulting party written notice of such default and the defaulting party shall have thirty (30) days in which to cure any default or the non-defaulting party shall have any and all rights against the defaulting party at law or equity. Notwithstanding the foregoing, there shall be no such notice and cure period (a) for payment default under Section 2 hereof (<u>except</u> that it shall not constitute a payment default unless payment is not received within five (5) days from the date when due), (b) for a lapse in the maintenance of insurance as set forth in Section 12 hereof, or (c) for a default under Sections 1, 4(a), 16 or 17 hereof.

(emphasis in original.)

---

[3] This sentence is contained within a subpart of Paragraph 2(b), a portion of the ERA that addresses payments made to Moosup. Though this sentence appears in a portion of the agreement associated with payments made to Moosup only, the sentence itself is an independent clause that stands alone and is one of several sentences following a broader introductory statement that describes both payments to Moosup <u>and</u> payments to OVM, i.e., "*[i]n connection with* the Compensation to be paid under Paragraph 2(a) of this Agreement, the parties *further* agree as follows." (emphasis added). The statement "time being of the essence" thus applies to all payments outlined in the ERA.

4

The ERA does not contain any provision expressly setting forth the procedures for termination in the event of a "default." It does include language, however, strongly suggesting that either party may terminate the ERA in the event of a default. (*See* Paragraph 1 ("Provided neither [Julian] nor any of [its] Agents have defaulted under the terms of this Agreement . . . , [Julian] may renew this Agreement annually for up to two (2) successive five (5) year periods . . . ."); Paragraph 4(b) (setting certain "Termination Requirements," including that "[Julian] shall remove all debris caused by [Julian] or [its] Agents and all equipment and materials from the Property and restore the Property in accordance with Section 1," and stating that "except for termination due to a default under this Agreement, the parties will thereafter have no further obligations . . . ."). It also sets forth language excusing the non-defaulting party from further performance. (Paragraph 19 ("No party shall unduly interfere with another party in the performance of its obligations under this Agreement except in the event of . . . a default under this Agreement . . . ."); Paragraph 5 ("During the Term of this Agreement and for so long as [Julian] is in compliance with all terms, conditions, and provisions of this Agreement, [OVM] and [Moosup] hereby grant [Julian] the exclusive right to excavate/remove any and all Minerals located on the Property.").)

Also relevant to analysis of a payment default is Paragraph 13F of the ERA, "Modifications; Waivers," which provides as follows:

> No provision of this Agreement may be[] amended, waived or modified, including, without limitation, by conduct, custom or course of dealing, other than by an express writing signed by the party against whom enforcement of such[] amendment, waiver or modification is sought.

### B. Payments by Julian

Julian began excavating stone from the Property in February 2012. (Hr'g Tr. at 32-34.) On March 2, 2012, Julian received a letter from James R. Cantara, Inc., the lender that had

5

financed OVM's purchase of the Property. (Exhibit 16.) The letter stated that, because OVM had defaulted on its payments to the lender and subsequently assigned its right to lease payments to the lender, Julian should direct any of its excavation and removal payments to the lender in lieu of OVM.[4] (*Id.*) Julian complied with this request. (*See* Exhibit 505; Hr'g Tr. at 40.) When Mr. Gauvin filed for bankruptcy in the spring of 2012, Julian redirected its payments to OVM.[5] (Hr'g Tr. at 40.) On January 10, 2013, Julian received a letter from James R. Cantara, Inc. stating that the bankruptcy petition had been dismissed and that, therefore, Julian should resume making payments to the lender. (Exhibit 17.) Once again, Julian complied with this request. (*See* Exhibit 505.) Due to resolution of OVM's dispute with its lender, Julian's payments again reverted to OVM in the summer of 2013. (*See* Hr'g Tr. at 37, 139-140.)

There is no dispute that Julian made multiple late payments to OVM, i.e., payments after the 15-day lag period. Julian's attorney conceded the frequency of late payment:

> THE COURT: The other question I had for you is do you dispute that there were payments made after the 15 days?
>
> MR. CORLETO: No, your Honor.
>
> THE COURT: A large number, wouldn't you say?
>
> MR. CORLETO: I agree, your Honor.

(*Id*. at 252.) For example, the record includes Exhibit 516C, which shows a copy of a July 29, 2013 check from Julian to OVM with payment for "weeks ending 07/06/2013 & 07/15/2013," and an August 17, 2013 check with payment for "weeks ending 7/22/2013 & 7/29/2013." Julian did not, however, deliver these checks to OVM until a meeting between the parties on September

---

[4] Mr. Guavin disputed the characterization of Julian's payments to OVM as "lease payments." (Hr'g Tr. at 36.)

[5] At the time of the bankruptcy, James R. Cantara, Inc. had a 50% interest in OVM as collateral. (Hr'g Tr. at 10, 38.) At some later point in time, Mr. Cantara and Mr. Gauvin resolved their differences, and Mr. Gauvin became the sole member and interest holder in OVM. (*See id*. at 10-11, 37.)

3, 2013. (Hr'g Tr. at 114-15.) Julian presented no evidence that it attempted to deliver these checks at an earlier date, even though Andrew Julian admitted that Julian could have delivered the check to Mr. Gauvin's son, who was frequently on-site to watch the excavation, prior to September 3, 2013. (*Id*. at 115.) Further, OVM was unable to deposit these checks because Julian instructed its bank to stop payment. (*Id*. at 121 (Julian's attorney: "Your Honor, we'll stipulate that my client stopped payment on the checks [Nos. 10256 and 10258] after the [September 3, 2013] meeting."); *see also* Exhibit 516D.) In addition, although OVM had continued to excavate in August and September 2013, as of the date of the November 21, 2013 hearing, OVM had not received any payment for stone excavated during those two months. (Hr'g Tr. at 218, 221.)

Correspondence from Mr. Gauvin to Julian shows that OVM repeatedly objected to Julian's late payments:

- "The payments of 8/11/12 and 8/25/12 are now due for the DIP account which set up for the Chapter 11 filing which is overseen by the courts." (Exhibit 510A, September 4, 2012 email.)

- "Notice of payment past due. Time is of the Essence. . . . Payment Past Due amounts to the value of 23 loads @ $6,900.00[.] In speaking to James Cantara yesterday he has stated that payments have not been sent to him neither [sic]." (*Id*., January 23, 2013 email.[6])

- "[I]t has now been revealed to me that you have not only not paid OVM up to date as contracted to but you have now bounced on payments for material removed from my property. . . . The Excavation Agreement that you have set your presents [sic] in my property with provides no cure for non payment never mind rubber checks." (*Id*., May 20, 2013 email.)

- "I am seeking . . . proof of CLEARED payments that have been made. You have been notified several weeks ago of your non curable default due to non payment and payments made that did not clear to insufficient funds. This default will not change. You have defaulted on OVM as well as Moosup Meadows." (*Id*., May 27, 2013 email.)

---

[6] Although Julian was sending payments at this time to James R. Cantara, Inc., rather than OVM, Mr. Gauvin's emails from this period still provide evidence that OVM consistently objected to the late payments.

7

- "Julian Development missed payments due last week to OVM . . . ." (*Id*., September 17, 2013 email.)

Although Jason Julian did not recall whether he received these emails (Hr'g Tr. at 185-86), I credit Mr. Gauvin's testimony that he sent them, that Julian received them, and that they are authentic (*see id*. at 176, 206-07).[7]

While it is not clear that OVM has standing to assert claims for late payments made to Moosup and James R. Cantara, Inc., such late payments are worth noting because they show a pattern of late payment behavior. (*See* Exhibit 505 (Check Nos. 993, 994, and 10078 returned for insufficient funds); Exhibit 516A (Check Nos. 10084-10086 returned for insufficient funds); Exhibit 516B (Check Nos. 855, 7585, 10008, 10009, 10063, 10070, and 10072-10075 returned for insufficient funds); Hr'g Tr. at 218 (Check No. 10077 returned for insufficient funds and was not replaced until May 13, 2013).) Although Andrew Julian attempted to excuse the bouncing of checks by stating that Moosup would hold checks and delay in depositing them, thereby creating a cash flow problem with the bank account used to fund these checks (Hr'g Tr. at 111), the evidence does not support this claim. For example, Check No. 7585, dated March 13, 2012, was returned due to insufficient funds just a week later, on March 21, 2012. (Exhibit 516B.) Check No. 855, dated May 29, 2013, was returned on June 6, 2012. (*Id*.) Many other returned checks fit a similar timeline.

---

[7] Mr. Gauvin's emails were disclosed to Julian three days before the November 21, 2013 hearing, giving Julian and its counsel an opportunity to review them. These emails were one of only eighteen exhibits submitted by OVM. (*See* dkt. # 43.) Nevertheless, when asked whether the Julian brothers or their counsel had done a search to determine whether the emails had actually been received, counsel responded that "we really hadn't focused on those emails until today." (Hr'g Tr. at 252-53.) Given the critical importance of these emails to the question of nonpayment (and any possible waiver of the nonpayment default provision), and in light of Jason Julian's testimony that Mr. Gauvin sent him "a very high volume of emails" (*id*. at 185), I find that Julian's lack of recollection or knowledge about these emails, after having been given advance notice that OVM would seek to introduce them at the hearing, lacks credibility.

### C. OVM's Termination of the Contract

On September 23, 2013, OVM sent Julian a notice of termination of the ERA. (Exhibit 2.) The letter alleged seven defaults of the ERA by Julian as a basis for termination: deficient certified loading lists, payment defaults, intermittent excavations, violations of federal law, violations of state law, defective performance bond, and interference with OVM's access.[8] (*Id.*) In September 2013, Mr. Gauvin changed the lock on the gate to the Property to prevent Julian's entry.[9] (Hr'g Tr. at 12, 48, 53-54.) On October 2, 2013, Mr. Gauvin called the Town of Plainfield police department to ask that the company be removed from the Property. (Exhibit 3.) The police told Julian that "Gauvin was the property owner and if he wanted them off the property then they would have to vacate the property." (*Id.*) Julian's equipment remained on the Property. (*See id.*; Hr'g Tr. at 55.) Julian then initiated this lawsuit.

### Conclusions of Law

### A. Legal Standard

To obtain a preliminary injunction under Fed. R. Civ. P. 65, Julian and OVM must each demonstrate "(1) that [it] will suffer irreparable harm absent injunctive relief, and (2) either (a) that [it] is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in [its] favor . . . ." *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and citations omitted). A prohibitory injunction seeks to "maintain the status quo pending a trial on the merits," while a mandatory injunction seeks to

---

[8] Because I find that Julian's payment defaults are dispositive, I do not address any of Julian's other alleged defaults.

[9] Mr. Gauvin could not recall whether the lock was changed after his counsel sent the termination letter, or after Julian had received a September 3, 2013 cease and desist letter from the Town of Plainfield (Exhibit 509). (*See* Hr'g Tr. at 48, 53-54.)

"alter the status quo by commanding some positive act." *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). When the injunction sought is mandatory, a "higher standard applies" because the movant must make a "'clear' or 'substantial' showing of a likelihood of success" on the merits. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

The "status quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994). In the last, peaceable, uncontested status of this case, Julian was excavating stone on the Property under the ERA. Therefore, as Julian seeks an order "directing OVM to refrain from interfering with Julian's right to enter, excavate, remove and sell stone . . . from the property," it seeks a prohibitory injunction, while OVM, which seeks an order requiring Julian to "cease all operations on the Property," seeks a mandatory injunction. *See Stockstill v. Quinnipiac Univ.*, No. 3:10-CV-265, 2010 WL 2011152, at *7 (D. Conn. May 19, 2010) (holding in dicta that a student who, prior to the controversy that gave rise to the suit, lived in on-campus housing and was enrolled in and attending classes at Quinnipiac, sought a prohibitory, rather than mandatory, injunction when asking the Court to reinstate his admission during the pendency of the suit). Thus, in order to prevail, Julian must make a showing that it is likely to succeed on the merits, and OVM must make a clear or substantial showing that it is likely to succeed on the merits.[10]

---

[10] Julian also filed an application for prejudgment remedy. To demonstrate an entitlement to a prejudgment remedy, Julian must show that there is "probable cause that a judgment in the amount of the prejudgment remedy sought . . . will be rendered in the matter in favor of the plaintiff . . . ." Conn. Gen. Stat. § 52-278e. For substantially the same reasons that the Court has concluded that OVM has established a clear and substantial showing that it is likely to succeed on the merits, the Court concludes that Julian has not met the standard required to obtain a prejudgment remedy against OVM.

**B. Likelihood of Success on the Merits**

The ERA is governed by Connecticut law.  (Ex. 1 at 15.)  Connecticut courts have held that timely payments are material to a contract when the contract provides that time is of the essence.  In *Banks Bldg. Co., LLC v. Malanga Family Real Estate Holding, LLC*, 102 Conn. App. 231, 238 (2007), the Connecticut Appellate Court stated that:

> When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable him to require performance from the other party.  Its commonly understood meaning is that insofar as a time for performance is specified in the contract, failure to comply with the time requirement will be considered to be a material breach of the agreement.

(Internal quotation marks and citations omitted).  Timely payments are often viewed as a material condition when the contract at issue creates a specific payment schedule to reflect the progress of work done.  *See, e.g., Silliman Co. v. S. Ippolito & Sons, Inc.*, 1 Conn. App. 72, 75 (1983) (Where an agreement with a subcontractor required payments "[n]et thirty days after [plaintiff] in-progress monthly estimates," the Court held that "[t]he general rule to be applied in construction cases is that the failure to make progress payments is a breach of contract so substantial as to render the contract nugatory.  The failure to make installment payments when due goes to the essence of a contract."  (citations omitted)); *W. Am. Ins. Co. v. Tindall*, CV054003262, 2007 WL 447287, at *4 (Conn. Super. Ct. Jan. 23, 2007) (Where a roofing company contracted for three equal payments of "1/3 down, 1/3 at halfway completed, balance upon completion," "[t]here can be no question the parties intended the time for payment be a material condition of the agreement in view of the provision payment was to be made in three (3) installments."); *Daley v. Petrowski*, 2001 WL 686847 (Conn. Super. Ct. May 22, 2001) (Where an excavator contracted for payments based on specific project milestones, "the plaintiff's

11

refusal to pay the defendants for the remainder of the second installment or for the additional work, which the plaintiff agreed to pay for, was a breach of the contract so substantial that it rendered the contract void and justified the defendants in terminating the contract and walking off the job.").

Here, Paragraph 2, the "Compensation" provision of the ERA, states that "payments shall be subject to time being of the essence." It also sets forth clearly delineated progress payments to be made on a semi-monthly basis. Further, in the event that Julian is more than five days late in making a payment, the contract permits OVM to have "any and all rights against [Julian] at law or equity," without requiring that OVM give Julian an opportunity to cure. When applying the law to the facts of this case, I find that OVM has shown a clear likelihood of success that it will be able to prove that Julian's repeated failures to make timely payment constitute payment default, as defined in the ERA, and a material breach of the contract.

Julian argues that any breach of the timely payment provision has been waived by the parties' course of conduct. (Hr'g Tr. at 252-53.) This argument fails for two reasons. First, OVM submitted credible evidence that it had repeatedly objected to Julian's late payments, thus rebutting the notion of waiver through course of conduct. Second, where, as here, the parties are sophisticated businesses who negotiated a contract that includes a nonwaiver provision (*see* Hr'g Tr. at 16, 159), courts will not find waiver through course of conduct. "While inconsistent conduct may, under certain circumstances, be deemed a waiver of a right to acceleration, the insertion of a nonwaiver clause is designed to avoid exactly such an inference." *Christensen v. Cutaia*, 211 Conn. 613, 619-20 (1989) ("[T]he plaintiff's earlier election to accept late payments rather than to enforce acceleration did not operate as a waiver of his contractual right to accelerate."); see also *S.H.V.C., Inc. v. Roy*, 188 Conn. 503, 506-07 (1982) (crediting trial court's

finding that nonwaiver clause was "clearly bargained for by the parties," the court held that "[t]he nonwaiver clause at issue has the effect of assuring that certain conduct, such as forebearance, may not carry the legal consequences which might ensue absent prior agreement").[11]

Because Julian made late payments, which were not waived by OVM, it defaulted on a material condition of the contract. That leaves the question of whether OVM was permitted to terminate the ERA and lock Julian out of the property. I find a substantial likelihood that OVM will be able to show that the ERA allowed it to do so. The ERA provides that Julian has the right to remove stone from the Property, "*for so long as* [it] is in compliance" with the ERA. (Paragraph 5 (emphasis added).) As a result, Julian should no longer be entitled to permission to perform its excavation activities following its payment default. Further, the ERA excuses OVM from its obligation to grant Julian the exclusive right to perform excavation activities on the Property in the event of a payment default. (*See* Exhibit 1, Paragraph 19 ("No party shall unduly interfere with another party in the performance of its obligations under this Agreement except in the event of . . . a default under this Agreement . . . .") Thus, even though the ERA's default provision itself is vague, permitting OVM to pursue "any and all rights . . . at law or equity," I find that the language of the contract, when viewed as a whole, permits OVM to terminate and lock Julian out of the Property upon a material breach for payment default. This finding means both that Julian has failed to make a showing that it is likely to succeed on the merits of its

---

[11] While a nonwaiver clause may be waived in specific, narrow situations, Julian has failed to identify any supporting case law that would merit waiver in this situation. *Compare Liberty Bank v. New London Ltd. P'ship*, No. 4005236, 2007 WL 1416944, at *8 (Conn. Super. Ct. May 1, 2007) (distinguishing *Christensen* and *S.H.V.C., Inc.* and finding waiver of a nonwaiver clause in a mortgage foreclosure suit where (1) giving effect to the nonwaiver clause would result in a very harsh result, (2) the nonwaiver clause was contained in a standard form contract drafted by only one party, and (3) the defaulting party was not informed that late payments would no longer be tolerated).

breach of contract claim, which is based on OVM's termination of the ERA and lockout of the Property, and that OVM has made a clear and substantial showing that it is likely to succeed on the merits of its claim that it was permitted to terminate the ERA on account of Julian's breach. (*See* Exhibit 1, Paragraphs 2 and 14.)  Because OVM has shown a clear likelihood of success on its ability to terminate, the Court may grant OVM specific performance of that right in ruling on these motions.  *See Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F. Supp. 1308, 1312, 1329 (N.D.N.Y. 1979) (granting plaintiff's motion for preliminary injunction and directing specific performance "[u]ntil a trial on the merits" under contract provision that gave plaintiff "the right to terminate the contract 'at any time for any reason' by giving [defendant] two days' prior written notice to such effect").[12]  Thus, consistent with Paragraph 4(b) of the ERA, Julian is ordered to vacate the Property and cease placing, maintaining, or locating its equipment on the Property.

The foregoing discussion also leads me to conclude that OVM has met its "clear likelihood of success on the merits" burden with respect to its trespass claim.  "The essentials of an action for trespass are: (1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory

---

[12] The Court notes that the testimony and arguments of counsel at the hearing were focused primarily on the agreement between the parties, and, specifically, on each party's claims that the other was in breach.  Julian's failure to show a likelihood of success on the merits with respect to its breach of contract claim necessarily warrants a finding that Julian has failed to show a likelihood of success on the merits with respect to its claims for conversion and breach of the covenant of good faith and fair dealing, both of which, in this case, are premised on the notion that OVM breached the ERA and had no right to lock Julian out of the property.  (*See* Am. Compl., Fourth Count ¶ 27 ("By attempting to declare a breach without a basis, by attempting to eject Julian from the Property without lawful basis . . . OVM has breached the covenant of good faith and fair dealing); Fifth Count ¶¶ 19-20 ("On or about October 3, 2013, OVM by its managing member Gauvin changed the lock on the gate to the property.  In doing so, OVM has wrongfully converted Julian's property.").)

interest; (3) done intentionally; and (4) causing direct injury."[13]  *City of Bristol v. Tilcon Minerals, Inc.*, 284 Conn. 55, 87 (2007).  When a party who once had permission to enter a parcel of land no longer has permission to do so, courts will find that trespass has occurred.  *See* Restatement (Second) of Torts § 158 cmt. l (1965) ("If the possessor of the land has consented to the actor's presence on the land, his failure to leave after the expiration of the license is a trespass . . . unless his continued presence on the land is otherwise privileged . . . ."); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 13 at 73 (5th ed. 1984) ("The trespass may also be committed by remaining on the land after a right of entry has terminated."); *c.f. State v. Steinmann*, 20 Conn. App. 599, 603 (1990) (finding simple trespass in violation of Conn. Gen. Stat. § 53a-110a where a man attended church services after being told he was no longer welcome on church property due to his disruptive behavior).  In addition, "trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it." Restatement (Second) of Torts § 161 (1965); *see also Town of Ashford v. Rogers*, No. CV119212, 2001 WL 195351, at *7 (Conn. Super. Ct. Feb. 2, 2001) (adopting Restatement (Second) of Torts § 161).

---

[13] "[A]ny interference with th[e] right [to absolute control and enjoyment of property], no matter how small or insignificant, necessarily inflicts some damages upon the property owner.  For example, a trespasser may interfere with a property right without inflicting substantial damage to the property, such as by entering the land . . . .  The land owner would have sustained an actual injury in that the trespasser interfered with his property right.  The actual damages suffered by the land owner would be nominal . . . ." Richard L. Newman & Jeffrey S. Wildstein, *Tort Remedies in Connecticut*, § 14-2(a) at 193 (1996); *see also Patalano v. Chabot*, 139 Conn. 356, 362, 94 A.2d 15, 18 (1952) ("Some damage necessarily follows any wrongful invasion of another's property." (citations omitted)).

Upon proper termination of the ERA, Julian would no longer have permission to enter the Property. Thereafter, there can be no question that the Property, which is owned by OVM, would be injured by the removal of stone, and that Julian's entry onto the Property to remove stone would be an intentional entry that affects OVM's possessory interest in the land. *See Caciopoli v. Lebowitz*, 309 Conn. 62, 68 (2013) (affirming common law action and damages for trespass where defendant removed trees from plaintiff neighbor's property under the mistaken belief that the trees were on defendant's property); *State v. Lamar Adver. of Hartford*, No. CV085020325, 2010 WL 4611744, at *8-15 (Conn. Super. Ct. Oct. 21, 2010) (finding trespass where billboard advertiser received a permit from the Department of Transportation, but failed to obtain permission from the landowner, who was the State of Connecticut, to remove trees from land abutting a highway).

Other jurisdictions have similarly held that, upon termination of an agreement, the continuation of mining or excavation activities constitutes a trespass. *See Greer v. Stanolind Oil & Gas Co.*, 200 F.2d 920, 923 (10th Cir. 1952) (where, unbeknownst to defendants, an oil and gas lease expired by its own terms, defendants' continued operations on the land constituted trespass, albeit an "innocent trespass"); *Big Six Dev. Co. v. Mitchell*, 138 F. 279, 281-83 (8th Cir. 1905) (In permitting termination of a mining agreement due to breach of contract and granting injunctive relief to prevent continued trespass, the court held that: "Threatened and continuous injuries to mines, quarries, timber growing upon lands, buildings located thereon, or other improvements of a permanent character, are enjoined, because, as has been said, such acts alter the character of the property, and also tend to destroy it, and occasion irreparable loss and damage. In such cases the threatened injuries are to the res, and diminish the value of the property itself, and an injunction will be granted to prevent the continuing waste or continuing

trespass, although the plaintiff is not in possession, and although the legal title has not been settled or questioned by an action at law." (internal quotation marks and citations omitted)).

### C. Irreparable Harm

Since Julian did not satisfy its burden of showing a likelihood of success on the merits, I need not discuss whether it will suffer irreparable harm absent injunctive relief, and turn instead to OVM's argument for irreparable harm. I note that the parties devoted very little attention to the issue of irreparable harm, and Julian did not address OVM's claim of irreparable harm at all. (*See* dkt. # 36).

As explained in *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009):

> [T]o satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.

(quotation marks and citations omitted).

OVM argues that "injunctions are granted in cases of trespass upon one's property," and that it "has no adequate remedy at law and will suffer irreparable harm without an injunction as it is the owner of a unique piece of property and Julian's actions, conduct and repeated breaches of the parties' Agreement pose a serious threat to OVM's property interest." (Dkt. # 29 at 10.) Connecticut courts have found injunctive relief appropriate in cases of trespass. In *Walton v. Town of New Hartford*, 223 Conn. 155 (1992), the Connecticut Supreme Court held that: "Injunction is available in a suitable case, and will ordinarily issue at the suit of a landowner to compel the removal of encroachments. The right to this remedy extends, in appropriate cases, to structures erected or privileges exercised under a license, upon revocation thereof." *Id*. at 166-67

(citations omitted) (affirming decision to grant injunctive relief for water drainage onto plaintiff neighbor's property after finding that license permitting water drainage had been properly revoked); *see also DPF Fin. Holdings, LLC v. Lyons*, No. WWMCV084007186, 2008 WL 5481218, at *4 (Conn. Super. Ct. Dec. 1, 2008) (granting injunctive relief where water, debris, and animal waste continually entered plaintiff's land); *Raph v. Vogeler*, 45 Conn. App. 56, 64 (1997) (where defendant encroached on plaintiffs' land with the construction of a patio, retaining wall, and other elements, affirming decision to grant injunctive relief based on finding that "while the plaintiffs could have valued the land on which the defendant encroached or the value of an easement, no monetary value could be placed on the loss of free access to and the use of the plaintiff's property."); *Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 316, 323 (D. Conn. 2002) (referencing Connecticut case law when noting in dicta that injunctive relief may be appropriate where plaintiffs had alleged, among other things, trespass and nuisance from a toxic chemical that had seeped into their ground water due to defendants' improper maintenance of an underground storage tank at a gasoline station).

In accordance with this precedent, I find that, in light of OVM's clear and substantial showing of a likelihood of success on the merits with respect to its breach of contract and trespass claims, a continuation of Julian's removal of stone from the Property would be an ongoing encroachment and limitation of OVM's use of the Property that would constitute irreparable harm. As suggested earlier, this finding comports with Paragraph 4(b) of the ERA, which establishes that, upon termination of the ERA, Julian "shall remove all debris caused by [Julian] or [its] Agents and all its equipment and materials from the Property and restore the Property in accordance with Section 1 . . . ."

## Conclusion

For the foregoing reasons, OVM's Motion for Preliminary Injunction (dkt. # 28) is GRANTED, and the Court hereby ORDERS as follows:

- Julian must cease all operations at the Property;

- Julian must cease placing, maintaining, or locating its equipment on the Property, in accordance with Paragraph 4(b)(iv) of the ERA. (Exhibit 1 at 5.)

- Other than for the removal of its equipment as specified above, Julian is prohibited from interfering with the Property.

The Court's Order granting OVM's Motion for Preliminary Injunction is STAYED pending the determination of the amount of bond that OVM must post in order to comply with Fed. R. Civ. P. 62(c). Both Julian and OVM shall submit briefs within 14 days from the entry of this Order detailing a proposal for the amount of the bond that is appropriate to protect Julian's interests.

With respect to the other pending motions, the Court ORDERS as follows:

- Julian's Motion for Prejudgment Remedy (dkt. # 4) is DENIED.

- Julian's Motion for Temporary Injunction (*see* dkt. # 22) is DENIED.

- OVM's Motion to Compel Compliance with Subpoena and Motion to Continue November 21, 2013 Hearing (dkt. # 52) is DENIED as moot.

- OVM's Motion for Contempt (dkt. #54) is DENIED.

- OVM's Motion in Limine (dkt. # 67) is DENIED as moot.

- OVM's Motion to Vacate the November 27, 2013 Temporary Stipulated Order (dkt. # 80) is DENIED as moot.

Finally, the parties shall submit, within 21 days from the entry of this Order, a Rule 26(f) Report complying with the Local Rules of this Court.

IT IS SO ORDERED.

/s
Michael P. Shea, U.S.D.J.

Dated:   Hartford, Connecticut
         April 11, 2014